Marian A. SPENCER et al.   Plaintiffs

v.

J. Kenneth BLACKWELL
et al.   Defendants

No.  C–1–04–738.

United States District Court,
S.D. Ohio,
Western Division.

Nov. 1, 2004.

the evening. Because of the grave due process and equal protection issues raised by the challenge process as it is to be employed in the November 2, 2004 election, the Court **GRANTS** Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

## I. FACTUAL BACKGROUND

Plaintiffs Marian and Donald Spencer reside in Avondale, a predominantly African–American neighborhood in Cincinnati, Ohio. The Spencers are legally registered African–American voters who vote in ward 13, precinct H. Marian Spencer estimates that one hundred percent of the voters in her precinct are African–American. The Spencers allege that the Hamilton County Board of Elections and the Hamilton County Republican Party have combined to implement a voter challenge system at the polls on Election Day that discriminates against African–American voters.

Each precinct is run by its election judges. Those judges constitute the election officers of the precinct. Ohio law requires the Hamilton County Board of Elections to designate at least four competent electors, of which no more than half may be members of the same political party. Ohio Rev.Code § 3501.22(A). If more officials are necessary to expedite the voting process, the Board may appoint additional officials. *Id.* If for whatever reason the Board determines that there are not enough qualified electors in a precinct to serve as precinct officers, the Board may appoint individuals who are at least seventeen and properly registered to vote to serve as precinct officers. Ohio Rev.Code § 3501.22(B). The Board designates one of the election judges as the presiding judge; the presiding judge is a

Alphonse Adam Gerhardstein, Jennifer Lynn Branch, Laufman & Gerhardstein, Cincinnati, OH, for Plaintiffs.

## ORDER GRANTING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

DLOTT, District Judge.

This matter comes before the Court on the Motion for Temporary Restraining Order and Preliminary Injunction (doc. # 2) of Plaintiffs Marian and Donald Spencer. The Spencers seek to restrain Defendants J. Kenneth Blackwell, in his official capacity as the Secretary of State of Ohio, Intervenor Defendant State of Ohio, the Hamilton County Board of Elections and its Chair Timothy Burke and members Michael Barrett,[1] Todd Ward, Daniel Radford and Director John Williams in their official capacities from discriminating against black voters in Hamilton County on the basis of race. If necessary, the Spencers seek to restrain Defendants from allowing challengers at the polls in Hamilton County. The Court held a telephone conference with all parties on Wednesday, October 27, 2004 and evidentiary hearings on Thursday, October 28, Friday, October 29, and Sunday, October 31, 2004, finishing late in

---

1. Defendant Michael Barrett is also sued in his official capacity as Chair of the Hamilton

County Republican Party.

member of the political party whose gubernatorial candidate won in that precinct in the last gubernatorial election. Ohio Rev. Code §§ 3501.22(A) and 3501.01(G). On October 22, 2004, the Hamilton County Republican Party filed for hundreds of challengers to be physically present in the polling places in order to challenge voters' eligibility to vote. *See* Ohio Rev.Code § 3505.21. Challengers serve as election officials on Election Day and must take an oath of office. Ohio Rev.Code § 3505.21.[2] Defendant Tim Burke testified that the County Republican and Democratic parties have traditionally filed a list of their precinct executives to serve as challengers, but that those named challengers have not actually come to the polling places or participated in the eligibility challenges in the past.

This year, however, the Ohio Republican Party declared that it planned "to have representatives acting as challengers in as many precincts as possible ... to ensure that voters are not disenfranchised by fraud." (Plaintiffs' ex. 13.) To that end, beyond the typically filed list of precinct executive challengers who have traditionally not come to the polls, the Hamilton County Republican Party filed to have 251 additional challengers. (Plaintiffs' ex. 3.) Tim Burke testified that the Hamilton County Democratic Party has also filed for hundreds of challengers in order to monitor Republican challengers.[3] Burke also testified that of the 251 challengers listed in Plaintiffs' exhibit 3, two-thirds of them filed to be challengers in predominantly African–American precincts. The evidence presented at the hearing reflects that 14% of new voters in a majority white location will face a challenger listed in Plaintiffs' exhibit 3, but 97% of new voters in a majority African–American voting location will see such a challenger. These statistics account only for challengers listed in Plaintiffs' exhibit 3 and do not account for those listed in Plaintiffs' exhibit 2. The Court heard no evidence, however, that the challengers listed in Plaintiffs' exhibit 2, the typically filed list of precinct executives, would fail to appear at the polling places in this election.

Ohio law does not instruct a challenger how to challenge a voter's eligibility or how to discern a voter's possible ineligibility. A person attempting to vote at a polling place may be challenged not only by a challenger, but also by any voter then lawfully in the polling place, or by any of the judges or clerk of elections. Ohio Rev.Code § 3505.20. If any voter is so challenged, the presiding judge administers an oath to the voter, and the election judges then ask him or her a series of questions depending on what basis he or she has been challenged. *Id.* Ohio Revised Code section 3505.20 instructs that a person may be challenged on the grounds that (1) he or she is not a citizen, (2) he or she has not resided in Ohio for thirty days immediately preceding the election, (3) he or she is not a resident of the county or precinct where he or she has arrived to vote, or (4) he or she is not of legal voting age. The statute further provides that the presiding judge shall put such other questions to the person challenged under section 3505.20 as are necessary to test that potential voter's qualifications. *Id.* at (D). If the person challenged cannot or will not answer the questions asked by the judges, is unable to answer the questions as they

---

2. Under Ohio Revised Code section 3505.21, challengers can be designated by a political party, a group with at lest five candidates, or a committee supporting or opposing a ballot issue.

3. Hamilton County anticipates 629 Republican challengers and 557 Democrat challengers.

were answered on the registration form corresponding to the voter's name, refuses to sign the voter's name, or for any other reason a majority of the judges believes that the person is not entitled to vote, "the judges shall refuse the person a ballot." *Id.* The decision of the judges shall be final as to the right of the person challenged to vote in the election. This part of section 3505.20 conflicts with, and is thus superceded by, federal law because the Help America Vote Act ("HAVA"), 42 U.S.C. § 15301 *et seq.* requires election officials to give a provisional ballot to any voter whose name does not appear on the rolls or whom an election official believes would be ineligible to vote. 42 U.S.C. § 15482.

Defendant Secretary of State Blackwell's office issued a memorandum to all county boards of elections on October 20, 2004, outlining challenger guidelines, stating "[b]ecause statutes do not specify the procedures and limitations for challenging voters, and because it is widely anticipated that challenger confusion could cause undue delays in voting, it is necessary to develop a policy for dealing with challenges posed at the precinct." (Plaintiffs' ex. 7 at 005.) Among other things, the memorandum instructed that challengers may challenge only for good cause, and may not interfere with the voting process or unnecessarily delay it—if a challenger challenges so many voters that his activities slow down the voting process or intimidate voters, the presiding judge should take immediate action, including expelling the challenger from the polling place. (*Id.*) The memorandum also instructs that whenever possible, the presiding judge[4] shall move the challenged voter to an area ten feet from the polling area and ask the voter the relevant questions by administering form 10–U[5] (*Id.* at 5–6; *see* form 10–U at *id.* at 12.) Form 10–U is an affidavit that requires a challenged voter to swear under oath that he or she will fully and truly answer the relevant questions concerning his or her eligibility and then sign the affidavit under penalty of a fifth degree felony for election falsification. (*Id.* at 7–8.)

Defendant Burke testified that Defendant Hamilton County Board of Elections then adopted a Witness and Challengers Policy (Plaintiffs' ex. 6) for the first time since the challenger law has been in effect. The Hamilton County policy reiterates Blackwell's instruction that challengers may challenge only in good faith and may not blanket challenge or randomly challenge voters. (*Id.* at 1–2.) There are no guidelines or directions regarding what constitutes a good faith challenge nor what quantum of delay is sufficient to exclude a challenger from the polls nor what behavior may be intimidating to voters.

There is significant confusion among Ohio's chief elections officer, Secretary of State Blackwell and chief law enforcement officer, State Attorney General Jim Petro, regarding whether challengers should, in

4. Although Blackwell's memorandum seems to indicate that only the presiding judge is necessary in the process of moving the voter ten feet away and asking him or her relevant questions about his or her eligibility, section 3505.20 refers to the *"judges"* asking a voter the relevant questions. It therefore seems clear that all election judges are required to administer the relevant questions to voters they suspect of ineligibility and all election judges are required to evaluate the response.

5. 10–U also states that "failing to answer any question fully or refusing to sign this form will result in the loss of your right to vote." (Plaintiffs' ex. 7.) As discussed above, this is a misstatement of the law because HAVA requires election officials to give a provisional ballot to any voter whose name does not appear on the rolls or whom an election official believes would be ineligible to vote. 42 U.S.C. § 15482.

fact, be allowed into polling places. On October 29, 2004 Defendant Blackwell issued a news release recommending the removal of challengers from polling places:

> As Secretary of State, it is my responsibility to conduct Ohio's elections in a manner as open and accessible as possible, consistent with the absolute requirements of integrity and fairness. While I do not agree there is any discriminatory intent or result from these statutes [allowing parties to place challengers in the polling places], I do believe a full airing of the issues cannot be completed prior to Tuesday's election. Therefore I have instructed the Attorney General to offer the following recommendation to the federal courts in Hamilton and Summit counties for resolution of these matters now: **All challengers of all parties shall be excluded from polling places throughout the state.**

(Plaintiffs' exhibit 15, emphasis in the original.) Attorney General Jim Petro issued a news release the same day contradicting Defendant Blackwell's recommendation:

> As Attorney General, I have a constitutional obligation to defend Ohio's laws when they are attacked. I express no view of whether it is right or wrong for any political party, candidate, or issue proponent or opponent to have challengers at the polls on Election Day ... until the law is finally declared to be unconstitutional, it is a valid law granting Ohio's citizens the right to be challengers if they have followed the proper procedure to do so.

(Ohio ex. 1.)

Finally, the evidence shows a significant amount of confusion regarding the training of designated challengers. The Court heard evidence at an October 31, 2004 hearing from Drew Hicks, an attorney designated as a Republican challenger. Hicks testified that the October 31 Republican challenger training session was attended by approximately 200 people, less than one third of the number of people designated as Republican challengers. He testified that each challenger received a mirror voter list containing the names of the people who voted in the challenger's precinct in 2000, a list of phone numbers that were redacted for purposes of the hearing, and the Hamilton County Board of Elections Witness and Challengers Policy (Plaintiffs' ex. 6). He testified that the challengers did not receive Defendant Blackwell's memorandum, to which the County Challengers Policy is only a supplement. Hicks also testified that the challengers were instructed to challenge only people listed as having requested an absentee ballot who then arrived to vote. Under section 3505.20, however, request of an absentee ballot is not an acceptable ground for challenge.[6]

Hicks's testimony also contradicts the contents of the training manual (Plaintiffs' ex. 17) that he was given: the training manual states that "non-resident of county or precinct" is likely to be the main basis for challenges on Election Day. (Plaintiffs' ex. 17 at 18.) Hicks testified that he would not challenge voters on the basis of the grounds outlined in § 3505.20 but instead would "raise the issue" with the presiding judge. Hicks was unable to articulate the difference between a challenge and "raising an issue." The main distinction, according to his testimony, was that in challenging an individual Hicks would state "I'm officially challenging this individual"

---

**6.** A person may be challenged on the grounds that (1) he or she is not a citizen, (2) he or she has not resided in Ohio for thirty days immediately preceding the elections, (3) he or she is not a resident of the county or precinct where he or she has arrived to vote, or (4) he or she is not of legal voting age. Ohio Rev. Code § 3505.20

and explain why. In "raising the issue" he would "remind" the presiding judge that the voter in question should receive a provisional ballot and if the presiding judge asked why, Hicks would give his reason. Hicks had no idea who had compiled the lists of voters that he was supposed to challenge [7] nor did he know if it was reliable. He did know that should he see the presiding judge give a regular ballot to a voter that Hicks believed should receive provisional ballot, Hicks should call one of the phone numbers given to him. He did not know what would happen if he called the number. The Court received no evidence that any Democrat challenger or issue proponent or opponent challenger has received any training of any kind on how to identify potentially ineligible voters or how to conduct challenges.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes the Court to grant a temporary restraining order or preliminary injunction. When deciding whether to issue a preliminary injunction, the Court considers four factors: "(1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir.2000). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985). A district court is not required to make specific findings concern-

ing each of the four factors used in determining a motion for preliminary injunction if fewer factors are determinative of the issue. *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 717 (6th Cir.2003).

## III. JURISDICTION AND STANDING

■ The Court has jurisdiction to consider this case under 28 U.S.C. §§ 1331 and 1343. Defendants argue that there is no case or controversy at issue here, and thus the Court's consideration of this case would violate the limits on judicial powers set forth in Article III section I of the United States Constitution. The requirements of Article III standing establish which cases truly present cases or controversies appropriate for this Court's consideration. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)

The "irreducible constitutional minimum" of Article III standing requires three elements: 1) the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected, concrete, and particularized interest, which is "actual or imminent, not conjectural or hypothetical," 2) a causal connection must exist between the injury and the conduct complained of such that the alleged injury is fairly traceable to the challenged action of the defendant, rather than the result of an independent action of some third party not before the court, and 3) it must be likely, rather than merely speculative, that the injury will be redressed by a favorable decision. *Id.* at 560–61, 112 S.Ct. 2130 (internal quotation marks omitted).

"A citizen's right to vote free of arbitrary impairment by state action has been judicially recognized as a right secured by

---

7. Hicks was given lists of voters who had registered for absentee ballots and who appeared on "death rolls."

the Constitution ...." *Baker v. Carr,* 369 U.S. 186, 208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The injury that the Spencers assert is that the application of Ohio's statute allowing challengers to challenge voters' eligibility places an undue burden on voters and impedes their right to vote. The injury is not speculative:

> [Plaintiffs] have standing to assert, at least, the rights of their members who will vote in the November 2004 election. [Plaintiffs] have not identified specific voters who will seek to vote at a polling place that will be deemed wrong by election workers, but this is understandable; by their nature, mistakes cannot be specifically identified in advance. Thus, a voter cannot know in advance that his or her name will be dropped from the rolls, or listed in an incorrect precinct, or listed correctly but subject to a human error by an election worker who mistakenly believes the voter is at the wrong polling place. It is inevitable, however, that there will be such mistakes. The issues [Plaintiffs] raise are not speculative or remote; they are real and imminent.

*Sandusky County Democratic Party v. Blackwell,* 2004 WL 2384445, at *6 (6th Cir.2004). This injury, if shown, is fairly traceable to Defendants' actions of placing these challengers at the polls and of doing so in the manner alleged. Finally, if challengers are removed from polling places, the asserted injury will be redressed.

## IV. ANALYSIS

### A. Likelihood of Success on the Merits

■ The Constitution provides that states may prescribe "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives ..." U.S. Constitution, Art. I, § 4, cl.1. The Supreme Court has repeatedly recognized that "as a prac-

tical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (quoting *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974)). Not every burden that a State's election system places on ballot access, voting, and association is unconstitutional. The relevant standard, set forth in *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), involves a balancing test between the severity of the burden and the importance of the State's interests:

> [The Court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson,* 460 U.S. at 789, 103 S.Ct. 1564. If an election regulation imposes a "severe" burden, the State regulation must be narrowly drawn to serve a compelling state interest. *Timmons,* 520 U.S. at 358–60, 117 S.Ct. 1364. If the regulation imposes a lesser burden, however, the State regulation must be justified only by important state regulatory interests. *Id.; Burdick v. Takushi,* 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).

## 1. Magnitude of the Burden

The Court begins with consideration of the first prong of the *Anderson* analysis—the magnitude of the burden imposed on voters by the application of Ohio's statute governing the challenge of voters at the polling place. The evidence before the Court shows that in Tuesday's election, the polling places will be crowded with a bewildering array of participants—people attempting to vote, challengers (Republican, Democrat, and issue proponents or opponents), and precinct judges. In the absence of any statutory guidance whatsoever governing the procedures and limitations for challenging voters by challengers, and the questionable enforceability of the State's and County's policies regarding good faith challenges and ejection of disruptive challengers from the polls,[8] there exists an enormous risk of chaos, delay, intimidation, and pandemonium inside the polls and in the lines out the door.

Defendant Burke testified that there are 550,000 registered voters in Hamilton County—there have been approximately 84,000 registered since January of 2004 and an untold number registered since the last election. In the race between parties over challengers, both sides have massed hundreds and hundreds of challengers without, so far as the evidence shows, any prior experience in the electoral process or any experience in determining the eligibility of potential voters. Further, the testimony reflects that despite the registration of challengers in the past, challengers have never before appeared at the polling place. In this election, however, the Board of Elections clearly expects challengers to appear at polling places, and, consequently, precinct judges will be put in the situation of attempting to limit, restrain, or even exclude hundreds of challengers without any prior experience of how to do so and without any significant guidance regarding what limits are appropriate.

The Ohio Legislature is mindful of how important every minute is on election day: no voter is allowed to occupy a voting compartment or use a voting machine more than five minutes when all the voting compartments or machines are in use and voters are waiting to occupy them. Ohio Rev.Code § 3505.23. The sheer number of people present in and around the polling place, the unprecedented number of newly registered voters, and the presence of inexperienced challengers, lacking any significant training and limited by precinct workers who have never before had to deal with such a situation, creates an extraordinary and potentially disastrous risk of intimidation and delay. Such intimidation and delay are virtually certain given the complete confusion among designated challengers and even between the two top elections officials of Ohio as to how this process will actually work. As voters see long lines looming and people being questioned ahead of them. Voter intimidation severely burdens the right to vote, and prevention of such intimidation is a compelling state interest. *Burson v. Freeman*, 504 U.S. 191, 206, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992). This Court finds that the presence of vast numbers of challengers inexperienced in the electoral process, under these conditions, imposes a severe burden on the right to vote of individual voters and of Ohio voters at large.

## 2. Ohio's Interests

Having established that the application of Ohio's statute allowing private party

---

**8.** Defendant Director of Hamilton County Board of Elections John Williams testified that a directive from the Secretary of State's Office has the force of law, but a memorandum serves only as a suggestion. Blackwell's correspondence of October 20, 2004 regarding challengers at the polling places is a memorandum.

challengers to challenge voters at the polling place imposes a burden of severe magnitude, the Court turns to the second step of the *Anderson* analysis—evaluating Ohio's asserted interests in support of its challenge statute. Ohio identifies the prevention of fraud and the ability of partisan challengers to "keep the other side honest" as interests. (Doc.# 17.) "[A]n examination of the history of election regulation in this country reveals a persistent battle between two evils: voter intimidation and election fraud." *Burson*, 504 U.S. at 206, 112 S.Ct. 1846. Prevention of election fraud is a compelling state interest. *Id.*

### 3. Tailoring of Regulation

As set forth above, if an election regulation imposes a "severe" burden, the State regulation must be narrowly drawn to serve a compelling state interest. *Timmons*, 520 U.S. at 358–60, 117 S.Ct. 1364. Having established both the severe burden imposed by the application in this case of Ohio's statute allowing challengers to challenge voter eligibility at the polls and Ohio's compelling interest in preventing election fraud, the Court must determine whether the regulation is narrowly drawn to serve those interests.

Ohio argues that in light of the huge numbers of newly registered voters and reports of fraudulent registration, a system allowing private challengers to question voter eligibility is a critical process. The Supreme Court has instructed that in pursuing important state interests, if there are other, reasonable ways to achieve those interests with a lesser burden on constitutionally protected activity "a State may not choose the way of greater interference. If it acts at all, it must choose less drastic means." *Dunn v. Blumstein,*

405 U.S. 330, 343, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (quoting *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960)) (internal quotations marks omitted).

In this case, the portion of § 3505.20 allowing private challengers to challenge the eligibility of a person offering to vote at a precinct is not narrowly tailored to serve Ohio's compelling interest in preventing voter fraud. Under the statute, bipartisan election judges and any elector then lawfully in the polling place may challenge the eligibility of any person offering to vote at that precinct. Election judges are seasoned, experienced workers in the electoral process. Defendant Burke testified that he and his co-chair of the Hamilton County Board of Elections were quite concerned when they saw that so many challengers had registered to be present on election day and were likewise concerned with the impact of several hundred lawyers attempting to take over the challenge process from the poll workers who are experienced in conducting that process. Defendant Director of the Hamilton County Board of Elections John Williams also testified that he is concerned about the election, understands that there could be confusion on Election Day with so many challengers, and trusts the poll workers to do a good job. Further, Defendant Blackwell's recommendation that the challengers be removed from the polls strongly undermines any argument that having these challengers at the polls is narrowly tailored to serve a compelling state interest. Defendant Blackwell's recommendation highlights the fact that the chief elections official of Ohio believes that fair elections can occur without the challenge process.[9] The conflict between Sec-

---

9. Nothing in this opinion should be construed to limit the authority of election judges to ensure voter eligibility.

retary of State Blackwell and Attorney General Petro indicates that even the two top officials responsible for enforcement of election laws disagree over the manner in which to proceed. How can the average election official or inexperienced challenger be expected to understand the challenge process if the two top election officials cannot?

Further, there are other protections in place to prevent election fraud. As registrations are received, the Board of Elections processes them and works to ensure that they are not fraudulent. The Board of Elections may conduct investigations, summon witnesses, and take testimony under oath regarding the registration of any voter. Ohio Rev.Code § 3503.25. Defendant Burke testified that the Board had, in fact, received registration cards of dubious authenticity, and the suspect registration cards either did not result in voter registrations or were registered and then cancelled. Further, any qualified elector of the county may challenge the right to vote of any registered elector to vote and the challenge will be considered by the Board of Elections at a hearing.[10] Ohio Rev. Code § 3503.24.

In this situation, the presence and actions of challengers serves the same interest as that of the election judges except that the presence and actions of the former poses an unacceptable risk of impeding the work of the election judges. Since the election judges are the individuals who are knowledgeable and experienced in the process of identifying potential ineligible voters, asking them the relevant questions, and making determinations, disruption of this system by over 1100 lawyers who have no experience in the process cannot be

said to be narrowly tailored to serve a compelling state interest in preventing voter fraud.

Indeed, because the evidence does not indicate that the presence of additional challengers would serve Ohio's interest in preventing voter fraud better than would the system of election judges without the additional challengers, the practice as applied here could not withstand even intermediate scrutiny. *Orr v. Orr*, 440 U.S. 268, 282, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979) (explaining that to survive intermediate scrutiny, practice must further state's interest better than would its absence.)

Because the Court concludes that Plaintiffs have shown a substantial likelihood of success on the merits on the ground that the application of Ohio's statute allowing challengers at polling places is unconstitutional, the Court declines to reach the other grounds for relief raised by Plaintiffs.

## B. Irreparable Harm

■ The Supreme Court has held that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). Because this Court has found that the application of Ohio's statute allowing private parties to challenge voters at the polls threatens or impairs Plaintiffs' constitutional right to vote, the Court must find that Plaintiffs will suffer an irreparable injury if the temporary restraining order does not issue.

---

**10.** Defendant State of Ohio argues that this Court's order in *Miller v. Blackwell*, 1:04–cv–735 "shut down Ohio's efforts to remove invalid voters from the rolls before the election, and an injunction here would strip the last line of defense at the ballot box." *Miller* did not eliminate the pre-election challenge process; rather it enjoined pre-election challenge hearings that violate the Due Process Clause.

See ACLU of Ky. v. McCreary County, Kentucky, 354 F.3d 438, 445 (6th Cir.2003) (citing Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)).

### C. Substantial Harm to Others

█ Because Plaintiffs have shown a substantial likelihood of success on the merits on the ground that the application of Ohio's statute allowing challengers at polling places is unconstitutional, "no substantial harm to others can be said to inhere in its enjoinment." See Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville, 274 F.3d 377, 400 (6th Cir.2001) (citing Connection Distrib. Co. v. Reno, 154 F.3d 281, 288 (6th Cir.1998)).

### D. Public Interest

█ " 'It is always in the public interest to prevent violation of a party's constitutional rights.' " Id. at 400 (citing G & V Lounge, Inc. v. Michigan Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994)). Thus, the public interest factor of the inquiry also weighs in favor of granting Plaintiffs' motion for injunctive relief.

## V. CONCLUSION

Because Plaintiffs have shown a substantial likelihood of success on the merits on the ground that the application of Ohio's statute allowing challengers at polling places is unconstitutional and the other factors governing the issuance of an injunction weigh in their favor, the Court **GRANTS** Plaintiffs' motion for injunctive relief and **ENJOINS** all Defendants from allowing any challengers other than election judges and other electors into the polling places throughout the state of Ohio on Election Day.

IT IS SO ORDERED.