# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 51227

BABE VOTE and LEAGUE OF WOMEN
VOTERS OF IDAHO,

    Plaintiffs-Counterdefendants-
    Appellants,

v.

PHIL MCGRANE, in his official capacity as
Idaho Secretary of State,

    Defendant-Counterclaimant-
    Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, December 2023 Term

Opinion Filed: April 11, 2024

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Samuel A. Hoagland, District Judge.

The decisions of the district court are <u>affirmed</u>.

Perkins Coie, LLP, Boise, for Appellants. Matthew P. Gordon argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. Joshua N. Turner argued.

---

BRODY, Justice.

This appeal concerns the people's right of suffrage and the constitutionality of two recent amendments to Idaho's election laws. Since 2010, Idaho law has required all electors to provide (1) proof of identity *and* Idaho residency when registering to vote, Idaho Code section 34-411, and (2) proof of identity before voting at the polls. Idaho Code §§ 34-1113 and -1114. During the 2023 legislative session, the legislature passed House Bills 124 and 340 (collectively "the House Bills"), which modified the forms of identification electors can use to prove their identity in both situations.

House Bill 124 amended Idaho Code section 34-1113 by removing student identification cards (issued by local high schools and accredited institutions of higher education) as accepted forms of identification for registered voters when voting at the polls. House Bill 340 amended

Idaho Code section 34-411 by (1) eliminating the option to prove identity by providing the last four digits of the registrant's social security number when registering to vote, and (2) adding new methods for a registrant to prove identity, including: a current Idaho driver's license or identification card (previously only the number was required); a United States passport or other federal identification card; a tribal identification card; or an Idaho license to carry a concealed weapon. House Bill 340 also amended Idaho Code section 49-2444 to provide a no-fee identification card to any individual who is eighteen years of age or older, "who has not possessed a current driver's license in the preceding six months," and who needs an identification card to comply with "voter registration or voting requirements." H.B. 340 § 8, 67th Leg., 1st Reg. Sess., 2023 Idaho Sess. Laws 886, 895.

BABE VOTE and the League of Women Voters of Idaho (the "League") filed suit against Phil McGrane, the Idaho Secretary of State (the "Secretary"), alleging that both bills violate the Idaho Constitution's guarantee of equal protection under Article I, section 2, and unduly burden the right of suffrage under Article I, section 19. In response, the Secretary counterclaimed, seeking a judgment declaring that the bills do not violate these rights under either the Idaho or the United States Constitutions. The Secretary subsequently filed motions for judgment on the pleadings and for summary judgment on his counterclaim. The district court granted the Secretary's motions and entered judgment in favor of the Secretary. BABE VOTE and the League timely appealed. We affirm the decisions of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. History of Voter Registration Laws

#### 1. *Proof of Identity for Registering to Vote*

Voting is a fundamental right guaranteed by the Idaho Constitution. *Van Valkenburgh v. Citizens for Term Limits*, 135 Idaho 121, 125-26, 15 P.3d 1129, 1133-34 (2000). The Idaho Constitution contemplates a registration requirement as a condition for becoming a qualified elector, Article VI, section 2, and expressly grants the legislature the authority to prescribe additional "qualifications, limitations, and conditions for the right of suffrage[,]" IDAHO CONST. art. VI, § 4. Over the years, the legislature has enacted various regulations governing the election process including, relevant to this case, proof of identification requirements for registrants seeking to vote and electors when voting at the polls. *See* Act of Mar. 10, 1970, ch. 140 § 46, 1970 Idaho Sess. Laws 351, 372–73.

Prior to the 2023 legislative session, Idaho Code section 34-411 allowed registrants to prove their identity when registering to vote with an Idaho driver's license or identification card or the last four digits of their Social Security number:

> Current driver's license number or identification card issued by the Idaho transportation department. In the absence of an Idaho driver's license or state issued identification card, the last four (4) digits of the elector's social security number.

I.C. § 34-411 (2012); *see also* Act of Apr. 3, 2012, ch. 211 § 3, 2012 Idaho Sess. Laws 570, 574.

In March 2023, the legislature passed House Bill 340, which added two subsections to section 34-411 listing the acceptable documentation to establish proof of residence and, relevant to this case, proof of identity. Act of Apr. 4, 2023, ch. 293 § 5, 2023 Idaho Sess. Laws 886, 889–90. As of July 1, 2023, the effective date of that legislation, Idaho Code section 34-411 now provides four forms of acceptable identification when registering to vote:

> (3) An individual shall prove identity for the purpose of registering to vote by showing one (1) of the following forms of photo identification:
> - (a)  A current driver's license or identification card issued pursuant to title 49, Idaho Code;
> - (b)  A current passport or other identification card issued by an agency of the United States government;
> - (c)  A current tribal identification card; or
> - (d)  A current license or enhanced license to carry concealed weapons issued under section 18-3302, Idaho Code, or section 18-3302K, Idaho Code.

I.C. § 34-411(3)(a)–(d). House Bill 340 also amended Idaho Code section 49-2444 to provide a four-year "no-fee identification card" to any individual who is eighteen years of age or older who (1) needs an identification card to comply with "voter registration or voting requirements"; and (2) "who has not possessed a current driver's license in the preceding six months[.]" I.C. § 49-2444(22); H.B. 340 § 8, 2023 Idaho Sess. Laws 886, 895.

*2.  Proof of Identity for Voting at the Polls*

In 2010, the legislature enacted Idaho Code sections 34-1113 and 34-1114, which required electors to show photo identification when voting at the polls or sign an affidavit in lieu of personal identification. *See* Act of Apr. 8, 2010, ch. 246, § 2, 2010 Idaho Sess. Laws 634, 635. As originally enacted, Idaho Code section 34-1113 recognized five forms of acceptable proof of identification, including student identification cards issued by high schools and accredited institutions of higher education:

3

All voters shall be required to provide personal identification before voting at the polls or at absent electors polling places as required by section 34-1006, Idaho Code. The personal identification that may be presented shall be one (1) of the following:

(1) An Idaho driver's license or identification card issued by the Idaho transportation department;

(2) A passport or an identification card, including a photograph, issued by an agency of the United States government;

(3) A tribal identification card, including a photograph;

(4) A current student identification card, including a photograph, issued by a high school or an accredited institution of higher education, including a university, college or technical school, located within the state of Idaho; or

(5) A license to carry concealed weapons issued under section 18-3302, Idaho Code, or an enhanced license to carry concealed weapons issued under section 18-3302K, Idaho Code.

I.C. § 34-1113 (2017); Act of Mar. 24, 2017, ch. 132, § 1, 2017 Idaho Sess. Laws 310. House Bill 124 amended this provision to eliminate the use of student identification cards as an acceptable form of identification to vote at the polls. H.B. 124 § 1, 67th Leg., 1st Reg. Sess., 2023 Idaho Sess. Laws 143.

Section 34-1114, which has not been amended and still exists, provides that if an elector cannot present the required personal identification, then that elector may complete an affidavit on a form prescribed by the Secretary of State:

If a voter is not able to present personal identification as required in section 34-1113, Idaho Code, the voter may complete an affidavit in lieu of the personal identification. The affidavit shall be on a form prescribed by the secretary of state and shall require the voter to provide the voter's name and address. The voter shall sign the affidavit. Any person who knowingly provides false, erroneous or inaccurate information on such affidavit shall be guilty of a felony.

I.C. § 34-1114.

## B.     Procedural Background

BABE VOTE is a nonpartisan, nonprofit corporation that endeavors to educate voters and encourage people, specifically young people, to vote. The League of Women Voters of Idaho is a nonpartisan, nonprofit corporation membership organization that encourages informed and active participation in the electoral process as part of its mission. The League also devotes "substantial time, effort, and resources to helping Idaho voters ensure their ballots are properly cast and

4

counted." Each entity seeks to increase participation in the election process and performs voter education, registration, and assistance activities.

Shortly after the passage of House Bills 124 and 340, BABE VOTE and the League (collectively "Plaintiffs") filed suit against Phil McGrane, the Idaho Secretary of State, challenging the new election laws. First, Plaintiffs alleged that House Bills 124 and 340 violate the Idaho Constitution's guarantee of equal protection under Article I, section 2 "by imposing heightened and unequal burdens on the fundamental right to vote, particularly for Idaho's youngest voters[.]" They also alleged House Bill 340 violates the Equal Protection Clause "by imposing heightened and unequal burdens" on "out of state students residing in Idaho to attend college or university who are eligible to vote in Idaho." Second, Plaintiffs alleged that House Bills 124 and 340 unduly burden the right of suffrage under Article I, section 19, by making it more difficult for Idaho's young electors to register and vote. Plaintiffs further alleged that House Bill 340's limitations on the accepted forms of identification for voter registration burden the right of suffrage for "out of state students residing in Idaho to attend college or university and who are eligible to vote in Idaho."

The Secretary answered and counterclaimed, seeking a declaratory judgment from the district court stating that the amendments passed by the legislature do not violate the Idaho Constitution or the United States Constitution. The Secretary alleged that House Bills 124 and 340 (1) "impose minimal if any burdens on the ability of eligible voters to vote[,]" (2) "do not classify based on age or upon any suspect class for purposes of equal protection[,]" and (3) "were enacted with the requisite rational basis as set forth in their statements of purpose."

The same day he filed his answer and counterclaim, the Secretary moved for judgment on the pleadings and for summary judgment on his counterclaim. The Secretary argued that the legislature's authority to regulate elections and power to place "qualifications, limitations, and conditions" on the right of suffrage pursuant to Article VI, section 4, of the Idaho Constitution permitted it to enact House Bills 124 and 340. The Secretary further argued that House Bills 124 and 340 do not violate either state or federal equal protection provisions because (1) the laws do not discriminate based on age, and even if they did, age has never been regarded as a suspect class; and (2) the laws complied with the *Anderson-Burdick* test, the standard of judicial review applicable in federal voting rights cases. *Burdick v. Takushi*, 504 U.S. 428, 432-34 (1992) (citation omitted). Under this test, the level of judicial scrutiny depends upon the severity of the

5

infringement. A state election law provision that imposes reasonable, nondiscriminatory restrictions upon the rights of voters will be upheld because the state's important regulatory interests are generally sufficient to justify the restrictions, but where the burden is severe, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434.

Plaintiffs opposed the motions, arguing that the *Anderson-Burdick* test was inapplicable when determining whether House Bills 124 and 340 violate the Idaho Constitution. Instead, Plaintiffs contended that strict scrutiny applied and that neither law could survive strict scrutiny review by the district court. Plaintiffs subsequently moved to enjoin the implementation of the changes to the law embodied in the House Bills after they had to cease voter registration efforts during public events in July 2023 because the Secretary's electronic voter registration system was down while the office made changes to its website to comply with the new laws.

The district court denied Plaintiffs' motion for preliminary injunction and granted the Secretary's motion for judgment on the pleadings. In addressing these motions, the district court explained that the central issue was whether House Bills 124 and 340 were subject to strict scrutiny or rational basis review. If the bills were subject to strict scrutiny, the district court reasoned, then BABE VOTE and the League would prevail; if they were subject to rational basis review then the Secretary would prevail. Concerning Plaintiffs' equal protection argument, the district court also determined that strict scrutiny was inapplicable because "students who will now be precluded from using their student identification cards at the polls[,] as well as persons who lack access to government-issued identification due to lack of access or means[,] . . . are not members of a suspect class." The district court further explained that "Plaintiffs seek to equate [barring the use of] student identification cards as [a] form of age discrimination against younger voters, but not all young people are students and not all students are young people."

Ultimately, the district court concluded that rational basis review was applicable to the House Bills because Article VI, section 4 of the Idaho Constitution specifically permits the legislature to prescribe "qualifications, limitations and conditions" on the right of suffrage:

> [T]he Idaho Constitution guarantees the right of free and lawful suffrage to the people, and delegates to the legislature the authority to prescribe the qualifications, limitations and conditions necessary for the exercise of the right. When balancing these two constitutional provisions, rational basis is the proper standard of scrutiny, not strict scrutiny, nor means-focus scrutiny.

6

Applying rational basis review, the district court determined that the bills were "rationally related to their stated purpose to clarify and create uniformity" and that requiring reliable forms of identification was a "reasonable condition to exercise the right of suffrage":

> In this case, the legislature has eliminated student identification cards as one of the previously acceptable forms of identification; however, it has also provided for free state identification cards as an alternate form of acceptable voter identification. Plaintiffs seek to equate student identification cards as a form of age discrimination against younger voters, but not all young people are students and not all students are young people. The new laws are rationally related to their stated purpose to clarify and create uniformity, by requiring only generally-accepted, authentic and reliable forms of identification as a reasonable condition to exercise the right of suffrage.

BABE VOTE and the League appealed, arguing that the district court erred by applying rational basis review to the House Bills.

## II.    STANDARDS OF REVIEW

"This Court freely reviews lower court decisions on both motions for judgment on the pleadings and motions for summary judgment." *Idaho Power Co. v. Idaho State Tax Comm'n*, 172 Idaho 125, ___, 530 P.3d 672, 675 (2023) (citations omitted).

> The standards of review for both types of motions are identical. Like judgment on the pleadings,
>
> > "[s]ummary judgment is appropriate if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Lockheed Martin Corp. v. Idaho State Tax Comm'n*, 142 Idaho 790, 793, 134 P.3d 641, 644 (2006). Furthermore, "[a]ll doubts are to be resolved against the moving party, and the motion must be denied if the evidence is such that conflicting inferences may be drawn therefrom, and if reasonable people might reach different conclusions." *G & M Farms v. Funk Irr. Co*., 119 Idaho 514, 516–17, 808 P.2d 851, 853–54 (1991).

*Id*. (alterations in original) (quoting *Union Bank, N.A. v. JV L.L.C*., 163 Idaho 306, 311–12, 413 P.3d 407, 412–13 (2017)).

"Constitutional issues and the construction and application of legislative acts are pure questions of law over which this Court exercises free review." *Nelson v. Pocatello*, 170 Idaho 160, 166, 508 P.3d 1234, 1240 (2022) (quoting *Struhs v. Prot. Techs., Inc*., 133 Idaho 715, 718, 992 P.2d 164, 167 (1999)) (remaining citation omitted). "The party challenging a statute on

constitutional grounds 'bears the burden' of establishing that the statute is unconstitutional 'and must overcome a strong presumption of validity.' " *Gomersall v. St. Luke's Reg'l Med. Ctr., Ltd.*, 168 Idaho 308, 314, 483 P.3d 365, 371 (2021) (quoting *Moon v. N. Idaho Farmers Ass'n,* 140 Idaho 536, 540, 96 P.3d 637, 641 (2004)). "The judicial power to declare legislative action invalid upon constitutional grounds is to be exercised only in clear cases." *Id.* (quoting *Moon*, 140 Idaho at 540, 96 P.3d at 641).

When interpreting the Idaho Constitution, we apply the same principles that govern statutory interpretation. *Reclaim Idaho v. Denney*, 169 Idaho 406, 427, 497 P.3d 160, 181 (2021) (citation omitted). These principles are well understood:

> The objective of statutory interpretation is to derive the intent of the legislative body that adopted the act. Statutory interpretation begins with the literal language of the statute. Provisions should not be read in isolation, but must be interpreted in the context of the entire document. The statute should be considered as a whole, and words should be given their plain, usual, and ordinary meanings. It should be noted that the Court must give effect to all the words and provisions of the statute so that none will be void, superfluous, or redundant. When the statutory language is unambiguous, the clearly expressed intent of the legislative body must be given effect, and the Court need not consider rules of statutory construction.

*Id*. (quoting *In Re Doe*, 168 Idaho 511, 516, 484 P.3d 195, 200 (2021) (internal citations omitted)).

### III.    ANALYSIS

### A.    Plaintiffs have standing to bring their claims.

The Secretary argues that we should dismiss this action because Plaintiffs lack standing to bring their claims. We note that, although the Secretary raises his standing argument for the first time on appeal, "the issue of standing is jurisdictional, [so] it can be raised at any time, including for the first time on appeal." *Smith v. Smith*, 167 Idaho 568, 582, 473 P.3d 837, 851 (2020) (alteration in original) (quoting *Campbell v. Parkway Surgery Ctr., LLC*, 158 Idaho 957, 961-62, 354 P.3d 1172, 1176-77 (2015)). "Standing is a threshold determination by this Court." *Reclaim Idaho*, 169 Idaho at 418, 497 P.3d at 172 (citing *State v. Philip Morris, Inc*., 158 Idaho 874, 881, 354 P.3d 187, 194 (2015)). Therefore, we must first determine whether Plaintiffs have standing to challenge the Amendments "before reaching the merits of the case." *Young v. City of Ketchum*, 137 Idaho 102, 104, 44 P.3d 1157, 1159 (2002) (citing *Miles v. Idaho Power Co*., 116 Idaho 635, 637, 778 P.2d 757, 759 (1989)).

"It is a fundamental tenet of American jurisprudence that a person wishing to invoke a court's jurisdiction must have standing." *Young*, 137 Idaho at 104, 44 P.3d at 1159. "Although the Idaho Constitution does not contain a 'case or controversy' clause like the United States Constitution, we have, to avoid advisory opinions, nevertheless adopted this self-imposed constraint from federal practice[.]" *Planned Parenthood Great Nw. v. State*, 171 Idaho 374, 401, 522 P.3d 1132, 1159 (2023).

Traditionally, "[a]n entity can have standing in one of two ways." *Idahoans for Open Primaries v. Labrador*, 172 Idaho 466, 476, 533 P.3d 1262, 1272 (2023). "First, the entity can have standing in its own right[,]" referred to as organizational standing; or "[s]econd, an entity may assert 'associational' standing on behalf of its members even when the entity does not have standing in its own right." *Id.* (citation omitted). To establish organizational standing, the entity must show "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Planned Parenthood Great Nw.*, 171 Idaho at 401, 522 P.3d at 1159 (quoting *Coeur d'Alene Tribe v. Denney*, 161 Idaho 508, 513, 387 P.3d 761, 766 (2015)).

Even when a party cannot meet traditional standing requirements, this Court has relaxed those requirements to hear cases "involving alleged constitutional violations that would otherwise go unaddressed because no one could satisfy traditional standing requirements." *Reclaim Idaho* at 422, 497 P.3d at 176 (first citing *Coeur d'Alene Tribe*, 161 Idaho 508, 387 P.3d 761; then citing *Regan v. Denney*, 165 Idaho 15, 21, 437 P.3d 15, 21 (2019)). To establish standing under the relaxed standard, a party must "allege[] sufficient facts concerning a possible constitutional violation of an urgent nature." *Coeur d'Alene Tribe*, 161 Idaho at 513–14, 387 P.3d at 766–67 (citations and internal quotation marks omitted).

Here, the Court must determine whether Plaintiffs have standing to challenge House Bills 124 and 340 under traditional organizational requirements or under the relaxed standard.

### 1. Plaintiffs do not meet traditional standing requirements to challenge House Bills 124 and 340.

Plaintiffs contend that they have organizational standing to sue because House Bills 124 and 340 frustrate both organizations' missions, including causing the cessation of voter registration efforts. Under federal case law, an entity may establish organizational standing by showing that "the challenged conduct frustrated their organizational missions and that they

9

diverted resources to combat that conduct." *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942 (9th Cir. 2021). An entity diverts "resources when they 'alter[ ] their resource allocation to combat the challenged practices,' but not when they go about their 'business as usual.' " *Id*. (alteration in original) (quoting *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019)). An injury based on "diversion of resources" "is sufficient to establish organizational standing at the pleading stage, even when it is 'broadly alleged.' " *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). This Court has not addressed whether an entity can establish standing to sue under this theory of injury. However, "Idaho has adopted the constitutionally based federal justiciability standard." *ABC Agra, LLC v. Critical Access Grp., Inc.*, 156 Idaho 781, 783 (2014). "When determining whether a party has standing, this Court has looked to United States Supreme Court decisions for guidance." *Coeur d'Alene Tribe*, 161 Idaho at 513, 387 P.3d at 766.

The "diversion of resources" theory of standing has its roots in *Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982). There, a fair housing organization called Housing Opportunities Made Equal ("HOME") challenged the alleged racially discriminatory steering practices of the owner of two apartment complexes in Virginia. *See id*. at 366–68. HOME's stated purpose was "to make equal opportunity in housing a reality in the Richmond Metropolitan Area." *Id*. at 368. To that end, it "provide[d] counseling and referral services for low- and moderate-income homeseekers," and engaged in the investigation and referral of complaints concerning housing discrimination. *Id*. at 368. HOME's complaint alleged that the defendant's conduct frustrated HOME's efforts:

> Plaintiff HOME has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. Plaintiff HOME has had to devote significant resources to identify and counteract the defendant's [*sic*] racially discriminatory steering practices.

*Id*. at 379.

"[C]onduct[ing] the same inquiry as in the case of an individual," the Supreme Court of the United States concluded that HOME had organizational standing. *Id*. at 378–79. It explained that, as "broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers," thus establishing injury in fact. *Id*. As the Court explained, "[s]uch concrete and demonstrable

10

injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.*

In this case, both Plaintiffs have alleged in their amended complaint that House Bills 124 and 340 have frustrated their missions by making it harder to help young people to register and vote. BABE VOTE also alleges that the bills impede BABE VOTE's mission by "limit[ing] the effectiveness of BABE VOTE's get out the vote efforts" and will force it to divert resources:

> As a result of HB 124 and HB 340, BABE VOTE will be forced to divert scarce resources, including volunteers and funds, away from existing registration and engagement efforts toward re-educating voters and volunteers about the available options for voter ID at the polls and registration and helping voters navigate the burdens HB 124 and HB 340 impose to ensure they can access the franchise. Eliminating Student IDs for voting and registration impedes BABE VOTE's efforts to expand the electorate and disenfranchises legally-eligible voters.

The League also alleges that the bills impede its mission of increasing voter turnout and "making elections more free, fair, and accessible to Idahoans regardless of age" and by "making registration harder for voters who are housing insecure, who are houseless, and who have disabilities":

> Altering the proof of residency requirements in this manner will disproportionately affect these populations. This will force the League to divert resources toward re-training its volunteers, which includes spending money and time updating training materials and literature. The League will also have to spend significant time and money re-educating voters about HB 124 and HB 340. These efforts must occur in the coming months because of the time it takes to create and distribute training materials, as well as develop training, in time for the next election.

In connection with their motion for preliminary injunctive relief, Plaintiffs also submitted declarations explaining that both organizations were impacted by House Bill 340 because it caused them to cease voter registration efforts, a key part of each organization's mission, due to the lack of certainty in how to register new electors. Kendal Shaber, the Youth Engagement and Voter Outreach Coordinator for the League, stated in his declaration that the organization did not know how to counsel new registrants about how they can prove their identity when registering through a third-party organization like the League:

> HB 340 went into effect on July 1, 2023, and it has already impacted the League's voter registration activities. The League has deep uncertainty about how to register voters under HB 340. Our attempts to get clarity on these points from

11

county clerks have not been successful. Because we do not know how to counsel new registrants about how they can prove their residency and provide identification if they register through a third party organization like the League, we are not comfortable conducting voter registration activities at all at this time. Indeed, the day before HB 340 went into effect, I sent an email to all Idaho local League of Women Voters presidents recommending that all Leagues suspend voter registration activity because of the uncertainty surrounding HB 340. Ex. A.

Yvonne "Sam" Sandmire, a board member of BABE VOTE, signed a similar declaration:

HB 340 went into effect on July 1, 2023, and it has already impacted BABE VOTE's voter registration efforts. Because BABE VOTE is uncertain about how individuals who fill out physical registration cards can go about proving their identity and residency as required under HB 340 if BABE VOTE returns those registration cards for them, as BABE VOTE has done in the past, BABE VOTE decided to only register voters using the Secretary's online registration method. I understand that as long as the registrant enters a valid driver's license number with the registrant's current address on the online form, the registrant does not need to provide additional proof of residency, so BABE VOTE had less uncertainty about how to register people to vote using the online system under HB 340. But the Secretary took down the online registration platform until July 10. The July 4 weekend and holiday traditionally presents significant opportunities for BABE VOTE to register many voters, but we either had to cancel our registration efforts at those events or our efforts were rendered less effective because the Secretary removed the online registration platform.

Even if we were inclined to adopt *Haven*'s framework as a basis to establish standing, Plaintiffs' amended complaint does not satisfy that framework. Plaintiffs allege that the removal of student identification will cause a future injury by forcing them to (1) "re-educat[e] voters and volunteers about the available options for voter ID at the polls" and (2) "re-train[] its volunteers, which includes spending money and time updating training materials and literature[.]" While it may be an inconvenience for Plaintiffs, having to "re-educate" voters and volunteers about changes in the law is not the "concrete and demonstrable" injury that the *Haven* framework requires. Indeed, the mission of these organizations *is* voter education. We agree with the Secretary that educating voters about the need to produce identification at the polls is not a new harm; it is part of the organizations' mission; thus, it is not a sufficient basis to invoke organizational standing.

2. *Plaintiffs have established a significant and distinct constitutional violation sufficient to demonstrate standing under our relaxed standard.*

While Plaintiffs cannot satisfy traditional standing requirements, this Court has noted "that it is willing to 'relax ordinary standing requirements in cases where: (1) the matter concerns

a significant and distinct constitutional violation, and (2) no party could otherwise have standing to bring a claim.' " *Tucker v. State*, 162 Idaho 11, 26, 394 P.3d 54, 69 (2017) (quoting *Coeur d'Alene Tribe*, 161 Idaho at 514, 387 P.3d at 767).

In *Coeur d'Alene Tribe v. Denney*, the Court relaxed the ordinary standing requirements to address the Coeur d'Alene Tribe's petition to certify a bill after various officials violated procedures for enacting laws and exercising the veto power under the Idaho Constitution. There, the legislature passed Senate Bill 1011 (2015), which repealed a law authorizing wagering on "historical" horse races. *Coeur d'Alene Tribe*, 161 Idaho at 511, 387 P.3d at 764. After the constitutional deadline had passed, the then-Governor vetoed Senate Bill 1011 and the Senate failed to override the veto. *Id* at 512, 387 P.3d at 765. The Tribe petitioned this Court for a Writ of Mandamus ordering the Secretary of State to certify Senate Bill 1011 as law, and the respondents challenged the Tribe's standing. *Id.* at 512–13, 387 P.3d at 765–66.

The Court held that the Tribe did not demonstrate a "distinct and palpable" injury sufficient to confer traditional standing. *Id.* at 513, 387 P.3d at 766. However, the Court further determined that the Tribe had standing under the relaxed standard because the case concerned "a significant and distinct constitutional violation[,]" if the Tribe's allegations were correct:

> The public has a significant interest in the integrity of Idaho's democratic government, and a writ of mandamus is a remedy by which public officials may be held accountable to the citizens for their constitutional duties. If the Tribe does not have standing to bring this writ, the question would then become, who does? Neither the members of the Senate, the Governor, nor the Secretary of State *appear ready or willing to challenge the constitutionality* of the Governor's purported veto or of the Senate's actions in this case. Thus, if the Tribe could not bring this writ, there would be no one to enforce the important constitutional provisions involved in this case or to ensure that the integrity of the law-making process is upheld.

*Id.* at 514, 387 P.3d at 767 (emphasis added).

Similar to the allegations in *Coeur d'Alene Tribe*, the Plaintiffs' amended complaint in this case alleges a significant and distinct constitutional violation. *See Van Valkenburgh v. Citizens for Term Limits,* 135 Idaho 121, 126, 15 P.3d 1129, 1134 (2000) (holding that voting is a fundamental right "[b]ecause the Idaho Constitution expressly guarantees the right of suffrage"). Furthermore, no party appears ready or willing to challenge the constitutionality of the House Bills because general voters affected by this legislation, and more specifically students and disabled people, likely do not have the resources or motivation to engage in costly and

13

lengthy litigation. Plaintiffs, on the other hand, have the resources and ability, and have alleged a sufficient "personal stake in the outcome of the controversy as to assure the concrete adversariness which sharpens the presentation upon which the court so depends for illumination of difficult constitutional questions." *Emps. Res. Mgmt. Co. v. Ronk*, 162 Idaho 774, 779, 405 P.3d 33, 38 (2017) (citation omitted). Therefore, we conclude that this case presents a sufficient constitutional dispute to relax traditional standing requirements, and we will address the merits of Plaintiffs' appeal.

**B.      House Bills 124 and 340 do not violate the right of suffrage or the equal protection clause of the Idaho Constitution.**

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Indeed, in *Van Valkenburgh v. Citizens for Term Limits*, we recognized that the right of suffrage is a fundamental right, and laws infringing on fundamental rights are generally subject to strict scrutiny. 135 Idaho 121, 126, 15 P.3d 1129, 1134 (2000).

Nevertheless, the exercise of this right is not without limitations. The Idaho Constitution expressly sets forth basic qualifications of electors, calls for the registration of voters under laws established by the legislature, and disqualifies certain felons and prisoners from voting:

> § 2. Qualifications of electors. Every male or female citizen of the United States, eighteen years old, who has resided in this state, and in the county where he or she offers to vote for the period provided by law, if registered as provided by law, is a qualified elector.

> § 3. Disqualification of Certain Persons. No person is permitted to vote, serve as a juror, or hold any civil office who has, at any place, been convicted of a felony, and who has not been restored to the rights of citizenship, or who, at the time of such election, is confined in prison on conviction of a criminal offense.

IDAHO CONST. art. VI, §§ 2–3. Article VI, section 4, further provides that the legislature may prescribe additional "qualifications, limitations and conditions" for the right of suffrage, but it may not "annul" any provision of Article VI which governs suffrage and elections:

> § 4. Legislature May Prescribe Additional Qualifications. The legislature may prescribe qualifications, limitations, and conditions for the right of suffrage, additional to those prescribed in this article, but shall never annul any of the provisions in this article contained.

IDAHO CONST. art. VI, § 4.

14

In this case, the legislature passed House Bills 124 and 340, which modified the accepted forms of identification which registrants may use to prove their identity when registering to vote and the forms of identification used by established electors to vote at the polls. Plaintiffs argue House Bills 124 and 340 violate the right of suffrage and equal protection guarantee of the Idaho Constitution by "erecting additional barriers to the franchise that inevitably will prevent some voters from voting." Plaintiffs, however, do not challenge the constitutionality of voter identification requirements in general. Nor do they allege violations of the federal Constitution. Instead, they allege that the legislature's removal of a specific form of identification, namely student IDs, as an acceptable method of proving identification, infringes on those rights under the Idaho Constitution.

We begin our analysis by determining the appropriate standard of review of laws that regulate the right of suffrage, and then apply that standard to the House Bills. For the reasons set forth below, we hold that House Bills 124 and 340 were reasonable exercises of the legislature's authority to enact additional "qualifications" and "conditions" on the exercise of this right and did not annul any provisions of Article VI or violate either the right of suffrage or the equal protection clause of the Idaho Constitution.

1. *Because the Idaho Constitution authorizes the legislature to prescribe qualifications, limitations, and conditions on the right of suffrage, the rational basis test applies.*

"It is generally presumed that legislative acts are constitutional, that the state legislature has acted within its constitutional powers, and any doubt concerning interpretation of a statute is to be resolved in favor of that which will render the statute constitutional." *Planned Parenthood Great Nw. v. State*, 171 Idaho 374, 439, 522 P.3d 1132, 1197 (2023) (quoting *Olsen v. J.A. Freeman Co.*, 117 Idaho 706, 709, 791 P.2d 1285, 1288 (1990)). "However, the general presumption is not always applicable." *Bradbury v. Idaho Jud. Council*, 136 Idaho 63, 68, 28 P.3d 1006, 1011 (2001). "[W]hen it is proposed by a statute to deny, modify, or diminish a right or immunity secured to the people by a clear and explicit constitutional provision, the presumption in favor of the constitutionality of statutes no longer applies, but a contrary presumption arises against the validity of such statute." *Id.* (quoting 16 Am. Jur. 2d Constitutional Law § 215 (1979)).

This "contrary presumption," also known as strict scrutiny review, is applied to statutes that infringe on a fundamental right or a suspect class. *Id.* at 68, 28 P.3d at 1011; *see also Osick*

15

*v. Pub. Emp. Ret. Sys. of Idaho*, 122 Idaho 457, 462, 835 P.2d 1268, 1273 (1992) (listing "nationality, race, or religion" as suspect classifications). Strict scrutiny review "is our most exacting standard" of constitutional review:

> It takes the usual presumption—that legislation is constitutional unless those opposing it can prove otherwise—and turns it on its head. Strict scrutiny presumes legislation is unconstitutional unless the government can prove otherwise by establishing it is necessary to further a compelling interest.

*Reclaim Idaho v. Denney*, 169 Idaho 406, 443–44, 497 P.3d 160, 197–98 (2021) (Brody, J., concurring in part and dissenting in part) (emphasis omitted) (internal citation omitted).

In this case, Plaintiffs do not allege that the House Bills infringe on a suspect classification. Instead, Plaintiffs contend that we should apply strict scrutiny review to the House Bills under each of their claims—violation of the right to vote and equal protection—because the Bills "affect and infringe Idahoans' fundamental right to vote." The Secretary contends that rational basis review is the applicable standard of review because Article VI, section 4, grants the legislature the authority to prescribe additional conditions on the right of suffrage and House Bills 124 and 340 are reasonable exercises of this expressed constitutional grant of authority.

In *Rudeen v. Cenarrusa*, 136 Idaho 560, 567, 38 P.3d 598, 605 (2001), we determined that "Article VI, § 4 specifically grants the authority to add limitations to the right of suffrage" provided that the legislature did not annul other provisions of Article VI: "i.e., secret ballot of § 1, qualification of electors of § 2, disqualifications of electors and office holders of § 3, residence requirements of § 5, recall of officers of § 6, or nonpartisan selection of supreme court and district judges of § 7 are made a nullity." However, while this Court has held that laws infringing on the right of suffrage are subject to strict scrutiny, we have never explicitly articulated the legal standard we apply when reviewing legislation enacted under Article VI, section 4. Rather, in a long line of cases we have consistently and unequivocally recognized that the legislature has broad authority to regulate the right of suffrage under this provision. *See*, *e.g., State v. Dunbar,* 39 Idaho 691, 701, 230 P. 33, 36 (1924) (stating that "[w]e must also bear in mind that our [l]egislature has been expressly invested with broad powers and wide discretion in the matter of legislating in regard to the exercise of the right of suffrage, by Const. art. 6, § 4," thus allowing the legislature to forbid a candidate from having his name on more than one ticket as the candidate of several parties for political office); *see also id.* at 705, 230 P. at 38 ("Under our constitutional provisions the [l]egislature has power to pass a law which bears a reasonable

16

relation to the purpose or object of regulating and conducting elections so as to insure the public welfare."); *Fisher v. Masters*, 59 Idaho 366, 377, 83 P.2d 212, 216 (1938) ("After reading and examining this provision of the constitution and the debates had in the convention, there is no room for doubt but that the framers of the constitution intended to vest in the legislature the power to prescribe *additional* 'qualifications, limitations and conditions' for the exercise of the right of suffrage.").

In *Van Valkenburgh v. Citizens for Term Limits*, we held that the right to vote was fundamental and laws infringing on that right were subject to strict scrutiny. 135 Idaho at 125–26, 15 P.3d at 1133–34. There, petitioners sought a writ of prohibition to prevent the Secretary of State from enacting an initiative which authorized the placement of "legends" on ballots showing which candidates had signed or broken term-limits pledges. *Id*. at 123-24, 15 P.3d at 1131-32. The petitioners alleged that the law violated their right to vote because it "greatly diminish[es] the likelihood the candidate of their choice will prevail in the election." *Id.* at 123–25, 15 P.3d at 1131–33. Addressing the constitutional issue, we explained "that voting is a fundamental right" and that, "if a fundamental right is at issue, the appropriate standard of review to be applied to a law *infringing* on that right is strict scrutiny." *Id*. at 126, 15 P.3d at 1134 (emphasis added). The initiative "infringe[d] on the fundamental right to vote, and undermine[d] the integrity of the ballot[,]" we determined, "because it '[would] interfere with the voters' right to cast their ballots, free from government interference.' " *Id*. at 126–27, 15 P.3d at 1134–35. Furthermore, we rejected the respondent's request to apply the "more 'flexible' standard of review" under the federal *Anderson-Burdick* test, because *Burdick* did not deal with the Idaho Constitution and because the challenged initiative was "not simply a time, place or manner voting restriction" to which a "more deferential" standard might be applied:

> The *Burdick* case is, however, distinguishable from the present case. First, *Burdick* did not deal with the Idaho Constitution and instead was decided under the United States Constitution. Secondly, the statute at issue in *Burdick* involved a prohibition on write-in voting, not a legend printed on the ballot itself by the state. Idaho Code § 34-907B, unlike the statute in *Burdick,* is not simply a time, place or manner voting restriction to which a more deferential standard of review might be applied. *See* [*Simpson v. Cenarrusa,* 130 Idaho 609, 615, 944 P.2d 1372, 1378 (1997)]. The ballot designation here relates to the very basic right of a voter to express support for a candidate within the sanctity of the voting booth. We find no reason to apply a different standard to the exercise of this fundamental right and will apply strict scrutiny to our analysis of I.C. § 34-907B.

17

*Id.* at 126, 15 P.3d at 1134.

One year later, in *Rudeen v. Cenarrusa*, 136 Idaho 560, 567, 38 P.3d 598, 605 (2001), we determined that an initiative placing term limits on candidates was authorized under the plain language of Article VI, section 4:

> Applying the foregoing rules of construction, Article III, § 1 and Article VI, § 4 provide the authority for the statutes in question. Article VI, § 4 specifically grants the authority to add limitations to the right of suffrage, provided none of the other provisions of Article VI, i.e., secret ballot of § 1, qualification of electors of § 2, disqualifications of electors and office holders of § 3, residence requirements of § 5, recall of officers of § 6, or nonpartisan selection of supreme court and district judges of § 7 are made a nullity.

*Id.* at 567, 38 P.3d at 605. Based on the "clear meaning of the language" and because the term limits statute did not "annul any provision" of Article VI, we held that the statute was "a valid exercise of the power granted in Article VI, § 4." *Id.*

With the forgoing in mind, we disagree with Plaintiffs' assertion that strict scrutiny review applies to *any* legislative act that creates qualifications, limitations, or conditions on the right of suffrage. First, as the United States Supreme Court has stated, "[e]lection laws will invariably impose some burden" upon voters. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). The Court explained:

> Each provision of a code, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote . . . . Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently.

*Id*. at 433 (internal quotation marks and citation omitted). In addition, Article VI, section 4, specifically grants the legislature the authority to place conditions, limitations, and qualifications on the right of suffrage. *Rudeen*, 136 Idaho at 567, 38 P.3d at 605.

Second, "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730, (1974); *see also Reclaim Idaho*, 169 Idaho at 429, 497 P.3d at 183 ("The ability of the legislature to make laws related to a fundamental right arises from the reality that, in an ordered society, few rights are absolute."). Accordingly, the mere fact that a

18

regulation creates some burden on the right of suffrage does not, in and of itself, compel strict review.

Plaintiffs cite *Van Valkenburgh*, *supra*, and *Reclaim Idaho*, *supra*, for the proposition that strict scrutiny is applied whenever a law is passed that affects the right of suffrage. However, such reliance is misplaced. *Van Valkenburgh* does not stand for the proposition that strict scrutiny is to be applied *any* time "a fundamental right is at issue[.]" *Id*. at 126, 15 P.3d at 1134. In fact, our decision recognized that "a more deferential standard of review might be applied" to a "time, place or manner voting restriction." *Id*. The initiative in that case was not simply a condition supported by the legislature's "compelling interest in protecting the integrity of the electoral process," but undermined ballot integrity by "transforming it from a means of choosing candidates to a billboard for political advertising[.]" *Id*. at 128, 15 P.3d at 1136 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 365 (1997)).

In *Reclaim Idaho*, we addressed the constitutionality of legislation that *effectively prevented* the people from exercising their initiative rights using its authority to enact conditions and the manner in which this right was exercised under the Idaho Constitution. 169 Idaho at 436, 497 P.3d at 190. There, petitioners sought a writ of prohibition to prevent the enforcement of Senate Bill 1110 (2021), which (1) prevented "any initiative approved by voters from taking effect before July 1 of the year following voter approval of the ballot initiative," and (2) "increased the legislative district requirement" for initiatives from 18 to every legislative district. 169 Idaho at 413, 497 P.3d at 167. Petitioners argued that the senate bills nullified the people's referendum and initiative rights under Article III, section 1, of the Idaho Constitution, *id*. at 412, 497 P.3d at 166, thus requiring the Court to apply strict scrutiny in reviewing the bills, *id*. at 430, 497 P.3d at 184. The legislature argued that a lower standard of scrutiny applied because it acted within its delegated power under the Idaho Constitution to prescribe the "conditions" and "manner" for the people's exercise of direct legislative power. *See id*. at 430, 497 P.3d at 184.

In addressing this issue, the Court was tasked to determine whether the legislature acted "within its delegated power to prescribe the 'conditions' and 'manner' for the people's exercise of direct legislative power, or whether it [had] exceeded its power." *Id*. at 426, 497 P.3d at 180. We began by recognizing that "the people's right to legislate is expressed as a positive right in the Idaho Constitution and is, therefore, fundamental." *Id*. at 430, 497 P.3d at 184 (When they amended the Idaho Constitution in 1912, "the people of Idaho expressly 'reserve[d] to

19

themselves' the [initiative and referendum] power[s]."). We further determined that the legislature's "conditions and manner authority plainly relate to the process of direct legislation[,]" but did not authorize the legislature to "effectively prevent the people from exercising this right by placing onerous conditions on the manner of its use." *Id.* at 429, 497 P.3d at 183 (emphasis omitted). Thus, "while the legislature has authority to define the processes by which these rights are exercised, any legislation that *effectively prevents* the people from exercising these rights will be subject to strict scrutiny[.]" *Id.* at 430, 497 P.3d at 184 (emphasis added). The Court determined that it was the latter.

"By requiring a threshold of support from every legislative district in the state[,]" we determined that the legislature "crafted a dramatic check on the ballot qualification process without showing a compelling need for such a check." *Id.* at 435-36, 497 P.3d at 189-90. Further, Senate Bill 1110's provision delaying the enactment of an initiative until after the following legislative session conflicted with the people's right to initiate legislation " 'on an equal footing' with other legislative acts." *Id.* at 439, 497 P.3d at 193 (quoting *Luker v. Curtis*, 64 Idaho 703, 706, 136 P.2d 978, 979 (1943), *abrogated on other grounds by Reclaim Idaho*, 64 Idaho 703, 136 P.2d 978). Thus, Senate Bill 1110 effectively prevented the people from exercising the ballot qualification process by giving "minority voters an effective veto over the will of the majority of voters." *Id.* at 436, 497 P.3d at 190. For these reasons, we determined that "strict scrutiny [was] the measuring stick that must be applied[.]" *Id.* at 431, 497 P.3d at 185.

Contrary to Plaintiffs' claim here, *Reclaim Idaho* did not establish the applicable standard for when the legislature acts "within its delegated power to prescribe the 'conditions' and 'manner' for the people's exercise of direct legislative power . . . ." *Id.* at 426, 497 P.3d at 180. Instead, we addressed a scenario where the legislature *effectively prevented* the people from exercising their initiative rights under the guise of regulation, thus infringing on the people's initiative rights. *Id.* at 436, 497 P.3d at 190.

Here, voter identification procedures, including the acceptable forms of identification, clearly fall within the broad ambit of the legislature's constitutional power to enact "qualifications" and "conditions" on the right of suffrage. IDAHO CONST. art. VI, § 4. Where there is no assertion that House Bills 124 and 340 "annul" the people's right of suffrage in violation of Article VI, section 4, we agree with the district court that rational basis review should be applied. This Court applied rational basis review 100 years ago in *State v. Dunbar*

20

when we had to decide whether a law prohibiting a person's name from appearing on a ballot more than once (the petitioner had been nominated for Congress by both the Democratic and Progressive parties) was unconstitutional. 39 Idaho 691, 230 P. 33 (1924). We held that it was not, explaining that the legislature has the power to pass laws that have a "reasonable relation" to the purpose of regulating and conducting elections for the public welfare:

> Under our constitutional provisions the [l]egislature has power to pass a law which bears a reasonable relation to the purpose or object of regulating and conducting elections so as to insure the public welfare. It is known to all that there are two schools of political thought, one of which lays stress upon the necessity and importance of parties and party integrity, in order that political contests may be conducted and decided in accordance with political principles and not become a mere scramble for personal preferment, the other of which minimizes, if it does not deny, the necessity and importance of parties and party integrity, and emphasizes the importance of voting for the individual–the man's the thing. Such questions of political philosophy and policy are for the [l]egislature to consider and determine, not for the courts. If one of the purposes of this statute be to preserve party integrity, we conclude that it is within the power of the [l]egislature to adopt reasonable measures to do this, so long as the law operates as the present one, evenly and impartially upon all parties. Petitioner has not pointed us to any provision of our Constitution, which the statute clearly infringes, nor to any implication necessarily and reasonably arising from the Constitution with which it conflicts. We hold the law to be constitutional.

*Id.* at 705, 230 P. at 38. Therefore, we conclude that the rational basis test applies and must next determine whether the test is satisfied.

> 2. *The House Bills pass rational basis review because they are reasonably related to a legitimate government purpose.*

Under rational basis review, a law will withstand scrutiny if it is "rationally related to a legitimate government purpose." *Planned Parenthood Great Nw. v. State*, 171 Idaho 374, 418, 522 P.3d 1132, 1176 (2023) (citing *Coghlan v. Beta Theta Pi Fraternity*, 133 Idaho 388, 396, 987 P.2d 300, 308 (1999)). "Rational basis review only requires us to determine whether 'there is any conceivable state of facts which will support [the statutory provision],' without judging 'the wisdom or fairness of the legislation being challenged.' " *Nelson v. Pocatello*, 170 Idaho 160, 170, 508 P.3d 1234, 1244 (2022) (alteration in original) (first quoting *Gomersall v. St. Luke's Reg'l Med. Ctr. Ltd.,* 168 Idaho 308, 319, 483 P.3d 365, 376 (2021); then quoting *Coghlan*, 133 Idaho at 396, 987 P.2d at 308).

"Because this case was decided on a motion for judgment on the pleadings, for the purposes of this appeal, we must accept the truth of appellants' allegations." *Jones v. City of St.*

21

*Maries*, 111 Idaho 733, 734, 727 P.2d 1161, 1162 (1986). Accordingly, in order to determine whether the district court erred in granting the Secretary's motion for judgment on the pleadings under rational basis review, we must determine whether the Plaintiffs pleaded sufficient facts indicating that there was not a conceivable state of facts to support the statutory amendments.

Plaintiffs allege that (1) House Bill "124's exclusion of photo ID cards issued by Idaho high schools and higher education institutions as acceptable forms of voter ID burdens the right to vote, particularly for young voters"; and (2) House Bill "340's limitations on the forms of ID and residency for voter registration burdens the right to vote, particular[ly] for young voters and out of state students residing in Idaho to attend college or university and who are eligible to vote in Idaho." Plaintiffs do not contend, however, that voter identification requirements in general burden the right of suffrage or the right to equal protection or that the bills create an impermissible burden, such as a poll tax, placed on only certain eligible electors. Nor do they allege any discrete violations of the federal Constitution. Rather, they argue that the legislature's recent removal of a specific means to establish identification, namely student IDs, infringes on the right of suffrage under the Idaho Constitution.

In this case, Plaintiffs allege in their petition that House Bill 124 unduly burdens young voters because "young people may face higher barriers to obtaining the forms of voter ID that remain permissible after HB 124":

> Notably, each of the now-permissible forms of voter ID cost the ID holder money to obtain; upon information and belief, student IDs were the only form of free photo ID that could be used to vote at the polls. And even though HB 340 includes a provision to create no-fee voter ID, it does not apply to everybody: voters who have or previously had, within the last six months, a current driver's license are ineligible, as are individuals under the age of 18. As a result, new residents of Idaho with driver's licenses from other states—which, under HB 124, cannot be used at the polls—may be unable to access the no-fee state ID. The limitation of the no-fee voter ID makes little sense in light of the proof of residency requirement and is unjustified and serves no purpose other than to make it more difficult for people who have moved to Idaho from other states to register to vote.

Accepting Plaintiffs' allegations as true, we conclude that Plaintiffs have not sufficiently pleaded that House Bill 124 is unsupported by any conceivable state of facts. Furthermore, Plaintiffs' allegations concerning House Bill 124's burden on college students and individuals who recently moved from out-of-state are disingenuous. House Bill 124 eliminated student identification as a means of proving identity at the polls, but it did not remove the provision of

Idaho law which allows any duly registered elector to show up at the polls and vote without identification of any kind simply by completing an affidavit in lieu of the personal identification on a form created by the Secretary of State. In other words, this available remedy addresses any burden placed on these electors by House Bill 124. Therefore, we conclude that House Bill 124 was a valid exercise of the legislature's power to enact conditions on the right of suffrage under Article VI, section 4 of the Idaho Constitution and the district court did not err in granting judgment on the pleadings in relation to House Bill 124.

Next, Plaintiffs allege that House Bill 340 unduly burdens right of suffrage of college students who come from other states to attend school in Idaho:

> HB 340 particularly affects college students coming from other states to attend school in Idaho. The no-fee ID created by the bill is available only to those voters who do not have *any* current driver's license within the last six months—excluding college students who attend school in Idaho but who still have valid driver's licenses from their prior home state and leaving those without other qualifying forms of ID with no way to register to vote. 2023 Idaho H.B. 340 § 8. Although this potentially affects all recent Idaho transplants, the bill's Statement of Purpose indicates that the no-fee ID is expressly intended to be an "alternative" to student IDs . . . .

Accepting these allegations as true, we likewise conclude that Plaintiffs failed to sufficiently plead that there was not a conceivable state of facts to support House Bill 340. Using the acceptable photo identification listed in House Bill 340 as the mode of ascertaining that the potential voter is a constitutionally qualified elector, and the removal of student identification, while burdensome to some, does not effectively annul the right of suffrage. As the United States Supreme Court has stated, "every voting rule imposes a burden of some sort." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. ___, ___, 141 S. Ct. 2321, 2338 (2021). "Voting takes time and, for almost everyone, some travel, even if only to a nearby mailbox." *Id*. "Casting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules." *Id*. Likewise, photo identification requirements will generally impose some burden on electors. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008). "For example, a voter may lose his photo identification, may have his wallet stolen on the way to the polls, or may not resemble the photo in the identification because he recently grew a beard." *Id.* Burdens arising from "life's vagaries, however, are neither so serious nor so frequent as to raise" serious questions about the constitutionality of photo identification

requirements, especially when available remedies exist to address "problems of that character." *Id.* at 197–98.

Here, it is undeniable that the legislature " 'has a compelling interest in preserving the integrity of its election process.' " *Brnovich*, 594 U.S. at ___, 141 S. Ct. at 2347 (quoting *Purcell v. Gonzalez*, 549 U.S. 1 (2006)); *see also Crawford*, 553 U.S. at 196 ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."). "While the most effective method of preventing election fraud may well be debatable," *Crawford*, 553 U.S. at 196, this Court will not judge "the wisdom or fairness of the legislation being challenged" on rational basis review. *Coghlan*, 133 Idaho at 396, 987 P.2d at 308. Determining the appropriate forms of personal identification for registration and voting, while prohibiting some forms deemed unreliable, is rationally related to this interest. Consequently, we conclude that House Bills 124 and 340 satisfy the rational basis test and Plaintiffs' complaint fails to state a claim for relief on this basis.

*3. The House Bills do not violate the Equal Protection Clause of the Idaho Constitution.*

Plaintiffs also alleged that House Bills 124 and 340 violate the Idaho Constitution's guarantee of equal protection under Article I, section 2 "by imposing heightened and unequal burdens on the fundamental right to vote, particularly for Idaho's youngest voters[.]" The equal protection provisions of the Idaho Constitution are set forth in Article I, sections 1 and 2:

> § 1. INALIENABLE RIGHTS OF MAN. All men are by nature free and equal, and have certain inalienable rights, among which are enjoying and defending life and liberty; acquiring, possessing and protecting property; pursuing happiness and securing safety.
>
> § 2. POLITICAL POWER INHERENT IN THE PEOPLE. All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform or abolish the same whenever they may deem it necessary; and no special privileges or immunities shall ever be granted that may not be altered, revoked, or repealed by the legislature.

"The principle underlying the equal protection" clause of the Idaho Constitution "is that all persons in like circumstances should receive the same benefits and burdens of the law." *Med. Recovery Servs., LLC v. Strawn*, 156 Idaho 153, 159, 321 P.3d 703, 709 (2014) (citation omitted). "This Court's equal protection analysis involves three steps: (1) identifying the classification under attack; (2) identifying the level of scrutiny under which the classification will be examined; and (3) determining whether the applicable standard has been satisfied."

*Planned Parenthood Great Nw.*, 171 Idaho at 439, 522 P.3d at 1197 (quoting *Gomersall*, 168 Idaho at 318, 483 P.3d at 375).

"We recognize three standards of review for equal protection challenges to a statute under the Idaho Constitution: strict scrutiny, means-focus, and rational basis." *Id.* at 439, 522 P.3d at 1197 (citation omitted). "Strict scrutiny applies in an equal-protection challenge to a statute if the statute discriminates on the basis of a suspect classification." *Id.* (citation omitted); *see also Osick v. Pub. Emp. Ret. Sys. of Idaho*, 122 Idaho 457, 462, 835 P.2d 1268, 1273 (1992) (listing "nationality, race, or religion" as suspect classifications). The "means-focus" test applies to an equal protection challenge to a statute only when "the discriminatory character of a challenged statutory classification is [1] apparent on its face and [2] where there is also a patent indication of a lack of relationship between the classification and the declared purpose of the statute[.]" *Planned Parenthood Great Nw.*, 171 Idaho at 440, 522 P.3d at 1198 (alterations in original) (quoting *Gomersall*, 168 Idaho at 318, 483 P.3d at 375). In all other cases, the "rational basis" test is applied. *Gomersall*, 168 Idaho at 318, 483 P.3d at 375 (quoting *Olsen v. J.A. Freeman Co.*, 117 Idaho 706, 710, 791 P.2d 1285, 1289 (1990)).

Plaintiffs cite *Olsen v. J.A. Freeman Co.* for the contention that strict scrutiny is the applicable standard of review to their equal protection claim because the claim involves a fundamental right. 117 Idaho at 710, 791 P.2d at 1289 ("Where the classification is based on a suspect classification or involves a fundamental right we have employed the 'strict scrutiny' test."). However, as we have discussed above, Plaintiffs have not alleged that House Bills 124 or 340 discriminate against a suspect classification, nor have they sufficiently alleged that these bills effectively annul the right of suffrage. Therefore, strict scrutiny is inapplicable.

The district court identified two potential classifications impacted by the House Bills: age, "students who will now be precluded from using their student identification cards at the polls," and "persons who lack access to government-issued identification due to lack of access or means[.]" The district court then determined (1) that rational basis review was applicable because neither classification was a suspect classification, and (2) that the new laws were rationally related to their stated purpose to clarify and create uniformity, by requiring only generally accepted, authentic and reliable forms of identification as a reasonable condition to exercise the right of suffrage.

We agree with the district court. First, a statutory classification based on age is not a per se suspect classification. *See Osick*, 122 Idaho at 462, 835 P.2d at 1273. Furthermore, we decline to address whether students, or the class of "persons who lack access to government-issued identification," are suspect classifications because Plaintiffs have not provided any argument or authority in their opening brief on this issue. "In order to be considered by this Court, the appellant is required to identify legal issues and provide authorities supporting the arguments in the opening brief." *Doe v. Doe*, 160 Idaho 854, 860, 380 P.3d 175, 181 (2016) (citation omitted).

Thus, the district court did not err by concluding that strict scrutiny review was inapplicable to the House Bills under an equal protection analysis. Consequently, we determine that the "rational basis" test is applicable to the House Bills and, like the district court, conclude that "[t]he new laws are rationally related to their stated purpose to clarify and create uniformity, by requiring only generally-accepted, authentic and reliable forms of identification as a reasonable condition to exercise the right of suffrage." For these reasons, we conclude that the district court did not err in granting judgment on the pleadings on Plaintiffs' equal protection claims against House Bills 124 and 340.

## IV.    CONCLUSION

For the reasons stated herein, we conclude House Bills 124 and 340 are reasonable exercises of the legislature's authority to enact conditions on the right of suffrage under Article VI, section 4 of the Idaho Constitution. Therefore, we affirm the district court's decision granting judgment on the pleadings. Costs are awarded to the Secretary as the prevailing party.

Chief Justice BEVAN, and Justices MOELLER, ZAHN and MEYER CONCUR.